# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

DANIEL MANOPLA, Individually and On
Behalf of All Others Similarly Situated,

§
§
§
§
§
§
§
§
§
§
§
§
§
§

Plaintiff,

v.

LEXICON PHARMACEUTICALS, INC.,
LONNEL COATS, and JEFFREY L. WADE,

Defendants.

Case No. 4:19-cv-00301

**JURY TRIAL DEMANDED**

## CLASS ACTION COMPLAINT

Plaintiff Daniel Manopla ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Lexicon Pharmaceuticals, Inc. ("Lexicon" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired Lexicon securities between March 11,

2016 and January 17, 2019, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.    Lexicon was founded in 1995 and is headquartered in The Woodlands, Texas. Lexicon is a biopharmaceutical company that focuses on the development and commercialization of pharmaceutical products for the treatment of human diseases.

3.    "Sotagliflozin" is the scientific name of one of Lexicon's orally-delivered small molecule drug candidates under development.  Sotagliflozin is in Phase 3 clinical trials for the treatment of type 1 and type 2 diabetes.

4.    In November 2015, Lexicon entered into a collaboration and license agreement with Sanofi S.A. ("Sanofi"), a French multinational pharmaceutical company.  Under the collaboration and license agreement, Lexicon granted Sanofi an exclusive, worldwide, royalty-bearing right and license to develop, manufacture and commercialize Sotagliflozin.  Lexicon is responsible for all clinical development activities relating to type 1 diabetes and retains an exclusive option to co-promote and have a significant role, in collaboration with Sanofi, in the commercialization of Sotagliflozin for the treatment of type 1 diabetes in the United States.  Sanofi is responsible for all clinical development and commercialization of Sotagliflozin for the treatment of type 2 diabetes worldwide and is solely responsible for the commercialization of Sotagliflozin for the treatment of type 1 diabetes outside the United States.

5.    On May 22, 2018, Sanofi filed a New Drug Application ("NDA") for "Zynquista" (the trademarked, commercialized name of Sotagliflozin) with the U.S. Food and Drug Administration ("FDA").  The NDA for Zynquista was based on data from the inTandem clinical

trial program that included three Phase 3 clinical trials (called, respectively, "inTandem1," "inTandem2," and "inTandem3") assessing the safety and efficacy of Zynquista in approximately 3,000 adults with inadequately controlled type 1 diabetes.

6.     According to Jorge Insuasty, Senior-Vice President, Global Head of Development, Sanofi, "[i]f approved, Zynquista would be the first oral antidiabetic drug approved in the U.S. for use by adults with type 1 diabetes, in combination with insulin."

7.     Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the data from Lexicon's Phase 3 clinical trials assessing the safety and efficacy of Sotagliflozin in treating type 1 diabetes were not as positive as Lexicon represented; (ii) the health risks posed by Sotagliflozin were severe enough to threaten its FDA approval prospects; and (iii) as a result, Lexicon's public statements were materially false and misleading at all relevant times.

8.     On January 17, 2019, Lexicon announced that the Endocrinologic and Metabolic Drugs Advisory Committee of the FDA (the "Advisory Committee") had "voted eight to eight on the question of whether the overall benefits of [Lexicon's product] Zynquista (sotagliflozin) outweighed the risks to support approval."

9.     On news of the Advisory Committee's stalemate, Lexicon's stock price fell $1.74 per share, or 22.6%, to close at $5.96 per share on January 18, 2019.

10.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

11.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and Section 27 of the Exchange Act.

13.     Venue is proper in this Judicial District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b).  Lexicon is headquartered in this District, Defendants conduct business in this District, and a significant portion of Defendants' actions took place within this District.

14.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

15.     Plaintiff, as set forth in the attached Certification, acquired Lexicon's securities at artificially inflated prices during the Class Period and were damaged upon the revelation of the alleged corrective disclosures.

16.     Defendant Lexicon is a Delaware corporation with its principal executive offices located at 8800 Technology Forest Place, The Woodlands, Texas 77381.  Lexicon's common stock trades in an efficient market on the Nasdaq Global Select Market ("NASDAQ") under the ticker symbol "LXRX."

17.     Defendant Lonnel Coats ("Coats") has served at all relevant times as the President and Chief Executive Officer ("CEO") of Lexicon.

18.     Defendant Jeffrey L. Wade ("Wade") has served at all relevant times as the Executive Vice President, Corporate and Administrative Affairs and Chief Financial Officer ("CFO") of Lexicon.

19.     The Defendants referenced above in ¶¶ 17-18 are sometimes referred to herein collectively as the "Individual Defendants."

20.     The Individual Defendants possessed the power and authority to control the contents of Lexicon' SEC filings, press releases, and other market communications.  The Individual Defendants were provided with copies of the Company's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with the Company, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

21.     Lexicon was founded in 1995 and is headquartered in The Woodlands, Texas.  Lexicon is a biopharmaceutical company that focuses on the development and commercialization of pharmaceutical products for the treatment of human diseases.

22.     "Sotagliflozin" is the scientific name of one of Lexicon's orally-delivered small molecule drug candidates under development.  Sotagliflozin is in Phase 3 clinical trials for the treatment of type 1 and type 2 diabetes.

23.     In November 2015, Lexicon entered into a collaboration and license agreement with Sanofi, a French multinational pharmaceutical company.  Under the collaboration and license agreement, Lexicon granted Sanofi an exclusive, worldwide, royalty-bearing right and license to develop, manufacture and commercialize Sotagliflozin.  Lexicon is responsible for all clinical development activities relating to type 1 diabetes and retains an exclusive option to co-promote and have a significant role, in collaboration with Sanofi, in the commercialization of Sotagliflozin for the treatment of type 1 diabetes in the United States.  Sanofi is responsible for all clinical development and commercialization of Sotagliflozin for the treatment of type 2 diabetes worldwide and is solely responsible for the commercialization of Sotagliflozin for the treatment of type 1 diabetes outside the United States.

24.     On May 22, 2018, Sanofi filed an NDA for "Zynquista" (the trademarked, commercialized name of Sotagliflozin) with the FDA.  The NDA for Zynquista was based on data from the inTandem clinical trial program that included three Phase 3 clinical trials (called, respectively, "inTandem1," "inTandem2," and "inTandem3") assessing the safety and efficacy of Zynquista in approximately 3,000 adults with inadequately controlled type 1 diabetes.

25.     According to Jorge Insuasty, Senior-Vice President, Global Head of Development, Sanofi, "[i]f approved, Zynquista would be the first oral antidiabetic drug approved in the U.S. for use by adults with type 1 diabetes, in combination with insulin."

**Materially False and Misleading Statements Issued During the Class Period**

26.     The Class Period begins on March 11, 2016, when Lexicon filed an Annual Report on Form 10-K with the SEC, announcing the Company's financial and operating results for the fiscal year ended December 31, 2015 (the "2015 10-K").  The 2015 10-K discussed the Phase 3 development of Sotagliflozin and cited previous results from its Phase 2 study, repeatedly touting

the drug's "significant" benefits in treating type 1 diabetes while simultaneously downplaying its

risks:

> Data from the [Phase 2] study showed that treatment with sotagliflozin demonstrated ***statistically significant benefits*** in the primary and multiple secondary endpoints. Patients treated with sotagliflozin experienced a reduction in their total daily mealtime bolus insulin dose of 32% compared to 6% for patients who received placebo (p=0.007). We also observed a ***significant improvement*** in glycemic control, with a mean A1C reduction of 0.55% in the sotagliflozin-treated group compared to a reduction of 0.06% in the placebo-treated group (p=0.002). These observations were also accompanied by ***significant improvement*** in the time spent in a glucose range of 70-180 mg/dl, a ***significant reduction*** in time in hyperglycemic range (>180 mg/dl) and no increase in time in hypoglycemic range (<70mg/dl). Multiple measures also indicated that patients treated with sotagliflozin experienced reduced variability in blood glucose levels. ***Sotagliflozin was well tolerated with no discontinuations of study medication due to adverse events.***

(Emphasis added).

27.     The 2015 10-K also touted Lexicon's new collaboration and licensing agreement

with Sanofi, highlighting the benefits of the agreement on the eventual commercialization of

Sotagliflozin for treatment of type 1 diabetes:

> We entered into a collaboration and license agreement with Sanofi in November 2015 under which we granted Sanofi an exclusive, worldwide, royalty-bearing right and license to develop, manufacture and commercialize sotagliflozin. ***We received a $300 million upfront payment under the agreement and we are eligible to receive up to $430 million upon the achievement of specified development and regulatory milestones and up to $990 million upon the achievement of specified sales milestones. We are also entitled to tiered, escalating royalties ranging from low double digit percentages to forty percent of net sales of sotagliflozin***, based on indication and territory, ***with royalties for the higher band of such range attributable to net sales for type 1 diabetes in the United States[.]***

(Emphasis added).

28.     The 2015 10-K also contained merely generic, boilerplate representations

concerning the risk that an NDA could fail to meet FDA regulatory hurdles:

> There can be no assurance that the FDA will accept an NDA for filing and, even if accepted for filing, that approval will be granted. The FDA may convene an

advisory committee to provide clinical insight on NDA review questions. Among other things, the FDA reviews an NDA to determine whether a product is safe and effective for its intended use and whether the facility in which it is manufactured, processed, packed, or held meets standards designed to assure the product's continued safety, purity and potency. The FDA may deny approval of an NDA if the applicable regulatory criteria are not satisfied, or it may require additional clinical data or an additional pivotal Phase 3 clinical trial. Even if such data are submitted, the FDA may ultimately decide that the NDA does not satisfy the criteria for approval. Once issued, the FDA may withdraw product approval if ongoing regulatory standards are not met or if safety problems occur after the product reaches the market. In addition, the FDA may require testing and surveillance programs to monitor the effect of approved products which have been commercialized, and the FDA has the power to prevent or limit further marketing of a product based on the results of these post-marketing programs. Limited indications for use or other conditions on labeling, marketing and distribution could also be placed on any approvals that could restrict the commercial applications of a product or impose costly procedures in connection with the commercialization or use of the product.

29.     In addition, the 2015 10-K contained merely generic, boilerplate representations regarding risks related to Sotagliflozin's review by the FDA, stating, in relevant part:

> *Clinical testing of our drug candidates in humans is an inherently risky and time-consuming process that may fail to demonstrate safety and efficacy, which could result in the delay, limitation or prevention of regulatory approval.*
>
> In order to obtain regulatory approvals for the commercial sale of any products that we may develop, we or our collaborators are required to complete extensive clinical trials in humans to demonstrate the safety and efficacy of our drug candidates. We or our collaborators may not be able to obtain authority from the FDA[.]
>
> * * *
>
> A number of companies in the pharmaceutical industry have suffered significant setbacks in advanced clinical trials, even after achieving positive results in earlier trials. Although the results of our Phase 2 proof-of-concept clinical trials of sotagliflozin in type 1 and type 2 diabetes patients were positive, we cannot assure you that the ongoing Phase 3 clinical trials of sotagliflozin in type 1 diabetes patients or the planned Phase 3 clinical trials of sotagliflozin in type 2 diabetes patients will achieve positive results . . . . Furthermore, we, one of our collaborators or a regulatory agency with jurisdiction over the trials may suspend clinical trials at any time if the subjects or patients participating in such trials are being exposed to unacceptable health risks or for other reasons.
>
> * * *

Moreover, clinical trials may not show our potential products to be both safe and effective. Thus, the FDA . . . may not approve any products that we develop for any indication or may limit the approved indications or impose other conditions.

*Our drug candidates are subject to a lengthy and uncertain regulatory process that may not result in the necessary regulatory approvals, which could adversely affect our and our collaborators' ability to commercialize products.*

Our drug candidates, including . . . sotagliflozin, as well as the activities associated with their research, development and commercialization, are subject to extensive regulation by the FDA . . . . Failure to obtain regulatory approval for a drug candidate would prevent us from commercializing that drug candidate. We and our collaborators have not received regulatory approval to market any of our drug candidates in any jurisdiction and have only limited experience in preparing and filing the applications necessary to gain regulatory approvals . . . . Any clinical trial may fail to produce results satisfactory to the FDA.

(Emphasis in original).

30. Appended as exhibits to the 2015 10-K were signed certifications by the Individual Defendants pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), "certify[ing] that: 1. Lexicon's [2015 10-K] fully complies with the requirements of section 13(a) or section 15(d) of the Securities Exchange Act of 1934, and 2. The information contained in the [2015 10-K] fairly presents, in all material respects, the financial condition and results of operations of Lexicon."

31. On March 6, 2017, Lexicon filed an Annual Report on Form 10-K with the SEC, announcing the Company's financial and operating results for the fiscal year ended December 31, 2016 (the "2016 10-K"). The 2016 10-K touted the positive results of Lexicon's Phase 3 clinical trials for Sotagliflozin, stating that the Company had "reported positive top-line primary efficacy endpoint data from two pivotal Phase 3 clinical trials of sotagliflozin in type 1 diabetes patients[.]"

32. The 2016 10-K noted how the inTandem Phase 3 clinical trials supported Sotagliflozin's "significant" benefits in treating type 1 diabetes while simultaneously downplaying the drug's risks. For example, with regards to the inTandem1 Phase 3 clinical trial, the 2016 10-K stated, in relevant part:

We reported top-line primary efficacy endpoint data in September 2016 from our pivotal inTandem1 Phase 3 clinical trial evaluating the safety and tolerability of sotagliflozin and its effects on glycemic parameters associated with type 1 diabetes. The trial enrolled 793 patients with type 1 diabetes in the United States and Canada in a randomized, double-blind, placebo-controlled study of 200mg and 400mg once daily doses of sotagliflozin over a 24-week treatment period, followed by a 28-week extension. The primary efficacy endpoint under evaluation in the trial was the reduction of hemoglobin A1c, or A1C, versus placebo on optimized insulin treatment at 24 weeks, with secondary endpoints including percentage of patients achieving A1C levels of less than 7%, reduction in meal-time, or bolus, insulin use, and weight loss. Top-line data from ***the study showed that patients treated with sotagliflozin experienced statistically significant reductions in A1C*** from baseline of 0.43% for the 200mg dose (p<0.001) and 0.49% for the 400mg dose (p<0.001), as compared to a reduction of 0.08% on placebo after 24 weeks of treatment, meeting the study's primary efficacy endpoint. Across all three dose arms (placebo, 200mg and 400mg), the incidence of treatment-emergent adverse events were 67.5%, 67.3% and 71.0%, respectively; the incidence of serious adverse events were 3.4%, 3.8% and 6.9%, respectively; and the incidence of discontinuation due to adverse events were 1.5%, 1.1% and 3.8%, respectively. Two primary safety concerns for patients with type 1 diabetes are severe hypoglycemia and diabetic ketoacidosis, or DKA. The number of patients with severe hypoglycemic events during the 24-week treatment period was 18 (6.7%), 11 (4.2%) and 12 (4.6%) in the placebo, 200mg and 400mg dose arms, respectively. The number of patients with DKA events during the 24-week treatment period was 0 (0.0%), 3 (1.1%) and 8 (3.1%) in the placebo, 200mg and 400mg dose arms, respectively. We are presently completing the 28-week extension portion of the study.

(Emphasis added).

33.    With respect to the inTandem2 Phase 3 clinical trial, the 2016 10-K stated, in relevant part:

We reported top-line primary efficacy endpoint data in December 2016 from our pivotal inTandem2 Phase 3 clinical trial evaluating the safety and tolerability of sotagliflozin and its effects on glycemic parameters associated with type 1 diabetes. The trial enrolled 782 patients with type 1 diabetes in Europe and Israel in a randomized, double-blind, placebo-controlled study of 200mg and 400mg once daily doses of sotagliflozin over a 24-week treatment period, followed by a 28-week extension. As with inTandem1, the primary efficacy endpoint under evaluation in the trial was the reduction of A1C versus placebo on optimized insulin treatment at 24 weeks, with secondary endpoints including percentage of patients achieving A1C levels of less than 7%, reduction in bolus insulin use, and weight loss. Top-line data from ***the study showed that patients treated with sotagliflozin experienced statistically significant reductions in A1C*** from baseline of 0.39% for the 200mg dose (p<0.001) and 0.37% for the 400mg dose (p<0.001), as compared

to a reduction of 0.03% on placebo after 24 weeks of treatment, meeting the study's primary efficacy endpoint. Across all three dose arms (placebo, 200mg and 400mg), the incidence of treatment-emergent adverse events were 51.4%, 55.9% and 54.4%, respectively; the incidence of serious adverse events were 3.5%, 4.2% and 4.2%, respectively; and the incidence of discontinuation due to adverse events were 1.6%, 1.9% and 3.0%, respectively. The number of patients with severe hypoglycemic events during the 24-week treatment period was 7 (2.7%), 10 (4.2%) and 6 (2.3%) in the placebo, 200mg and 400mg dose arms, respectively. The number of patients with DKA events during the 24-week treatment period was 0 (0.0%), 1 (0.4%) and 3 (1.1%) in the placebo, 200mg and 400mg dose arms, respectively. We are presently completing the 28-week extension portion of the study.

(Emphasis added).

34.     The 2016 10-K also noted that Lexicon was conducting a third Phase 3 clinical trial and that "[Lexicon] and Sanofi are presently preparing for the submission of an application for regulatory approval to market sotagliflozin for the treatment of type 1 diabetes in the United States."

35.     The 2016 10-K also touted Lexicon's collaboration and licensing agreement with Sanofi, highlighting the benefits of the agreement on the eventual commercialization of Sotagliflozin for treatment of type 1 diabetes:

We entered into a collaboration and license agreement with Sanofi in November 2015 under which we granted Sanofi an exclusive, worldwide, royalty-bearing right and license to develop, manufacture and commercialize sotagliflozin. *We received a $300 million upfront payment under the agreement and we are eligible to receive up to $210 million upon the achievement of specified clinical development milestones, up to $220 million upon the achievement of specified regulatory milestones and up to $990 million upon the achievement of specified commercial milestones. We are also entitled to tiered, escalating royalties ranging from low double digit percentages to 40 percent of net sales of sotagliflozin, based on indication and territory, with royalties for the higher band of such range attributable to net sales for type 1 diabetes in the United States[.]*

(Emphasis added).

36.     The 2016 10-K also contained merely generic, boilerplate representations concerning the risk that an NDA could fail to meet FDA regulatory hurdles:

There can be no assurance that the FDA will accept an NDA for filing and, even if accepted for filing, that approval will be granted. The FDA may convene an advisory committee to provide clinical insight on NDA review questions. Among other things, the FDA reviews an NDA to determine whether a product is safe and effective for its intended use and whether the facility in which it is manufactured, processed, packed, or held meets standards designed to assure the product's continued safety, purity and potency. The FDA may deny approval of an NDA if the applicable regulatory criteria are not satisfied, or it may require additional clinical data or an additional pivotal Phase 3 clinical trial. Even if such data are submitted, the FDA may ultimately decide that the NDA does not satisfy the criteria for approval. Once issued, the FDA may withdraw product approval if ongoing regulatory standards are not met or if safety problems occur after the product reaches the market. In addition, the FDA may require testing and surveillance programs to monitor the effect of approved products which have been commercialized, and the FDA has the power to prevent or limit further marketing of a product based on the results of these post-marketing programs. Limited indications for use or other conditions on labeling, marketing and distribution could also be placed on any approvals that could restrict the commercial applications of a product or impose costly procedures in connection with the commercialization or use of the product.

37.     In addition, the 2016 10-K contained merely generic, boilerplate representations

regarding risks related to Sotagliflozin's review by the FDA, stating, in relevant part:

> *Clinical testing of our drug candidates in humans is an inherently risky and time-consuming process that may fail to demonstrate safety and efficacy, which could result in the delay, limitation or prevention of regulatory approval.*
>
> In order to obtain regulatory approvals for the commercial sale of any products that we may develop . . . we or our collaborators are required to complete extensive clinical trials in humans to demonstrate the safety and efficacy of our drug candidates. We or our collaborators may not be able to obtain authority from the FDA[.]
>
> * * *
>
> A number of companies in the pharmaceutical industry have suffered significant setbacks in advanced clinical trials, even after achieving positive results in earlier trials. Although the primary efficacy endpoint top-line results of our two pivotal Phase 3 clinical trials of sotagliflozin in type 1 diabetes patients were positive, we cannot assure you that positive results will be achieved in those clinical trials with respect to additional endpoints or safety during the full duration of the study, or in our ongoing third Phase 3 clinical trial of sotagliflozin in type 1 diabetes patients . . . . Furthermore, we, one of our collaborators or a regulatory agency with jurisdiction over the trials may suspend clinical trials at any time if the subjects or

patients participating in such trials are being exposed to unacceptable health risks or for other reasons.

\* \* \*

Moreover, clinical trials may not show our drug candidates to be both safe and effective. Thus, the FDA . . . may not approve any additional drug candidates that we develop for any indication or may limit the approved indications or impose other conditions.

*Our drug candidates are subject to a lengthy and uncertain regulatory process that may not result in the necessary regulatory approvals, which could adversely affect our and our collaborators' ability to commercialize products.*

Our drug candidates, as well as the activities associated with their research, development and commercialization, are subject to extensive regulation by the FDA . . . . Failure to obtain regulatory approval for any drug candidate would prevent us from commercializing that drug candidate . . . . The process of obtaining regulatory approvals is expensive, and often takes many years, if approval is obtained at all, and can vary substantially based upon the type, complexity and novelty of the drug candidates involved . . . . Furthermore, prior to approving a new drug, the FDA typically requires that the efficacy of the drug be demonstrated in two double-blind, controlled studies. The regulatory process also requires nonclinical testing, and data obtained from nonclinical and clinical activities are susceptible to varying interpretations, which could delay, limit or prevent regulatory approval. In addition, delays or rejections may be encountered based upon changes in regulatory policy for product approval during the period of product development and regulatory agency review. Changes in regulatory approval policy, regulations or statutes or the process for regulatory review during the development or approval periods of our drug candidates may cause delays in the approval or rejection of an application.

(Emphasis in original).

38. Appended as exhibits to the 2016 10-K were signed SOX certifications by the Individual Defendants "certify[ing] that: 1. Lexicon's [2016 10-K] fully complies with the requirements of section 13(a) or section 15(d) of the Securities Exchange Act of 1934, and 2. The information contained in the [2016 10-K] fairly presents, in all material respects, the financial condition and results of operations of Lexicon."

39.     On March 1, 2018, Lexicon filed an Annual Report on Form 10-K with the SEC, announcing the Company's financial and operating results for the fiscal year ended December 31, 2017 (the "2017 10-K").  The 2017 10-K touted the positive results of Lexicon's Phase 3 clinical trials for Sotagliflozin, stating that the Company had "reported positive top-line data from two pivotal Phase 3 clinical trials and a third Phase 3 clinical trial of sotagliflozin in type 1 diabetes patients."

40.     The 2017 10-K repeatedly stressed how the inTandem Phase 3 clinical trials supported Sotagliflozin's "significant" benefits in treating type 1 diabetes while simultaneously downplaying the drug's risks.  For example, with regards to the inTandem1 Phase 3 clinical trial, the 2017 10-K stated, in relevant part:

> We reported top-line primary efficacy endpoint data in September 2016 and additional data in May 2017 from our pivotal inTandem1 Phase 3 clinical trial evaluating the safety and tolerability of sotagliflozin and its effects on glycemic parameters associated with type 1 diabetes. The trial enrolled 793 patients with type 1 diabetes in the United States and Canada in a randomized, double-blind, placebo-controlled study of 200mg and 400mg once daily doses of sotagliflozin over a 24-week treatment period, followed by a 28-week extension. Insulin therapy was optimized in patients over a 6-week period prior to dosing. The primary efficacy endpoint under evaluation in the trial was the reduction of hemoglobin A1c, or A1C, versus placebo on optimized insulin treatment at 24 weeks, with secondary endpoints including percentage of patients achieving A1C levels of less than 7% without experiencing an event of severe hypoglycemia or diabetic ketoacidosis, or DKA, change in meal-time, or bolus, insulin use, body weight, fasting plasma glucose and patient-reported assessments. Data from ***the study showed that patients treated with sotagliflozin experienced <u>statistically significant reductions in A1C</u>*** from baseline of 0.43% for the 200mg dose (p<0.001) and 0.48% for the 400mg dose (p<0.001), as compared to a reduction of 0.07% on placebo after 24 weeks of treatment, meeting the study's primary efficacy endpoint at both dose levels. ***The A1C benefit achieved with sotagliflozin was sustained with <u>statistically significant results</u> over the full 52-week duration of the study for both the 200mg and 400mg doses.*** Benefits in all secondary efficacy endpoints were observed in both the 200mg and 400mg dose arms compared to placebo, ***with <u>statistically significant improvements</u> in all secondary efficacy endpoints observed in the 400mg dose arm and in the percentage of patients achieving A1C levels of less than 7% without any severe hypoglycemia or DKA events and weight loss observed in the 200mg dose arm and <u>statistically significant improvements</u>***

*in all secondary efficacy endpoints observed in the 400mg dose arm.* Over the full 52-week treatment period, the incidences of treatment-emergent adverse events in the placebo, 200mg and 400mg dose arms were 80.6%, 81.7% and 79.8%, respectively; the incidences of serious adverse events were 7.5%, 10.3% and 11.1%, respectively; and the incidences of discontinuation due to adverse events were 4.1%, 4.9% and 6.5%, respectively. Potential cases of severe hypoglycemia and DKA were reviewed by a blinded adjudication panel, which determined whether such cases met pre-established diagnostic criteria. The number of patients with positively adjudicated severe hypoglycemic events during the full 52-week treatment period was 26 (9.7%), 17 (6.5%) and 17 (6.5%) in the placebo, 200mg and 400mg dose arms, respectively. The number of patients with positively adjudicated DKA events during the full 52-week treatment period was 1 (0.4%), 9 (3.4%) and 11 (4.2%) in the placebo, 200mg and 400mg dose arms, respectively.

(Emphasis added). Notably, these statements wholly failed to convey the import of the various adverse events suffered by the trial's participants and how such data might impact Sotagliflozin's review by the FDA.

41. With respect to the inTandem2 Phase 3 clinical trial, the 2017 10-K stated, in relevant part:

We reported top-line primary efficacy endpoint data in December 2016 and additional data in August 2017 from our pivotal inTandem2 Phase 3 clinical trial evaluating the safety and tolerability of sotagliflozin and its effects on glycemic parameters associated with type 1 diabetes. The trial enrolled 782 patients with type 1 diabetes in Europe and Israel in a randomized, double-blind, placebo-controlled study of 200mg and 400mg once daily doses of sotagliflozin over a 24-week treatment period, followed by a 28-week extension. Insulin therapy was optimized in patients over a 6-week period prior to dosing. As with inTandem1, the primary efficacy endpoint under evaluation in the trial was the reduction of A1C versus placebo on optimized insulin treatment at 24 weeks, with secondary endpoints including percentage of patients achieving A1C levels of less than 7% without experiencing a severe hypoglycemia or DKA event, change in bolus insulin use, body weight, fasting plasma glucose and patient-reported assessments. Data from *the study showed that patients treated with sotagliflozin experienced <u>statistically significant reductions</u> in A1C* from baseline of 0.39% for the 200mg dose (p<0.001) and 0.37% for the 400mg dose (p<0.001), as compared to a reduction of 0.02% on placebo after 24 weeks of treatment, meeting the study's primary efficacy endpoint at both dose levels. *The A1C benefit achieved with sotagliflozin was sustained with <u>statistically significant results</u> over the full 52-week duration of the study for both the 200mg and 400mg doses. <u>Statistically significant improvements</u> in all secondary efficacy endpoints were observed in both the 200mg and 400mg dose arms compared to placebo.* Over the full 52-week

treatment period, the incidences of treatment-emergent adverse events in the placebo, 200mg and 400mg dose arms were 61.2%, 68.2% and 68.8%, respectively; the incidences of serious adverse events were 6.6%, 10.0% and 8.0%, respectively; and the incidences of discontinuation due to adverse events were 3.5%, 3.8% and 6.8%, respectively. Potential cases of severe hypoglycemia and DKA were reviewed by a blinded adjudication panel, which determined whether such cases met pre-established diagnostic criteria. The number of patients with positively adjudicated severe hypoglycemic events during the full 52-week treatment period was 13 (5.0%), 13 (5.0%) and 6 (2.3%) in the placebo, 200mg and 400mg dose arms, respectively. The number of patients with positively adjudicated DKA events during the full 52-week treatment period was 0 (0.0%), 6 (2.3%) and 9 (3.4%) in the placebo, 200mg and 400mg dose arms, respectively.

(Emphasis added). Again, these statements, while repeatedly touting the "significant" benefits of Sotagliflozin, wholly failed to convey the import of the various adverse events suffered by the trial's participants and how such data might impact Sotagliflozin's review by the FDA.

42. With respect to the inTandem3 Phase 3 clinical trial, the 2017 10-K stated, in relevant part:

We reported top-line data in June 2017 from our inTandem3 Phase 3 clinical trial evaluating the safety and tolerability of sotagliflozin and its effects on glycemic parameters associated with type 1 diabetes. The trial enrolled 1,405 patients with type 1 diabetes in the United States and Europe in a randomized, double-blind, placebo-controlled study of a 400mg once daily dose of sotagliflozin over a 24-week treatment period. Insulin therapy was not optimized in patients and eligibility criteria included any background insulin therapy. The primary efficacy endpoint under evaluation in the trial was the proportion of patients achieving A1C levels of less than 7% at 24 weeks without experiencing a severe hypoglycemic or DKA event, with secondary endpoints including the change from baseline in A1C, body weight, systolic blood pressure and bolus insulin use. Data from ***the study showed statistically significant superiority of sotagliflozin*** (28.6%) compared to placebo (15.2%) in the proportion of patients achieving A1C levels of less than 7% without experiencing a severe hypoglycemic or DKA event (p<0.001), meeting the study's primary endpoint. ***Patients treated with sotagliflozin also experienced statistically significant improvements*** in all secondary efficacy endpoints compared to placebo. The incidences of treatment-emergent adverse events in the placebo and 400mg dose arms were 52.5% and 55.1%, respectively; the incidences of serious adverse events were 3.3% and 6.9%, respectively; and the incidences of discontinuation due to adverse events were 2.3% and 6.3%, respectively. Potential cases of severe hypoglycemia and DKA were reviewed by a blinded adjudication panel, which determined whether such cases met pre-established diagnostic criteria. The number of patients with positively adjudicated severe hypoglycemic events

during the 24-week treatment period was 17 (2.4%) and 21 (3.0%) in the placebo and 400mg dose arms, respectively. The number of patients with positively adjudicated DKA events during the 24-week treatment period was 4 (0.6%) and 21 (3.0%) in the placebo and 400mg dose arms, respectively. Results from the inTandem3 trial were published in the New England Journal of Medicine in September 2017.

(Emphasis added). As with the inTandem1 and inTandem2 Phase 3 clinical trials, the 2017 10-K repeatedly touted the "significant" benefits of Sotagliflozin while wholly failing to convey the import of the various adverse events suffered by the trial's participants and how such data might impact Sotagliflozin's review by the FDA.

43.     As with Lexicon's 2015 10-K and 2016 10-K, the 2017 10-K touted Lexicon's collaboration and licensing agreement with Sanofi, highlighting the benefits of the agreement on the eventual commercialization of Sotagliflozin for treatment of type 1 diabetes:

We entered into a collaboration and license agreement with Sanofi in November 2015 under which we granted Sanofi an exclusive, worldwide, royalty-bearing right and license to develop, manufacture and commercialize sotagliflozin. In December 2016, Sanofi terminated its rights under the agreement with respect to Japan. *We received a $300 million upfront payment under the agreement and we are eligible to receive up to $210 million upon the achievement of specified clinical development milestones, up to $220 million upon the achievement of specified regulatory milestones and up to $990 million upon the achievement of specified commercial milestones. We are also entitled to tiered, escalating royalties ranging from low double digit percentages to 40 percent of net sales of sotagliflozin, based on indication and territory, with royalties for the higher band of such range attributable to net sales for type 1 diabetes in the United States[.]*

(Emphasis added).

44.     The 2017 10-K also contained merely generic, boilerplate representations concerning the risk that an NDA could fail to meet FDA regulatory hurdles:

There can be no assurance that the FDA will accept an NDA for filing and, even if accepted for filing, that approval will be granted. The FDA may convene an advisory committee to provide clinical insight on NDA review questions. Although the FDA is not required to follow the recommendations of an advisory committee, the agency typically does so. Among other things, the FDA reviews an NDA to determine whether a product is safe and effective for its intended use and whether

the facility in which it is manufactured, processed, packed, or held meets standards designed to assure the product's continued safety, purity and potency. The FDA may deny approval of an NDA by way of a Complete Response letter if the applicable regulatory criteria are not satisfied, or it may require additional clinical data or an additional pivotal Phase 3 clinical trial. Even if such data are submitted, the FDA may ultimately decide that the NDA does not satisfy the criteria for approval. An NDA may be approved with significant restrictions on its labeling, marketing and distribution under a Risk Evaluation and Mitigation Strategy or otherwise that could restrict the commercial applications of a product or impose costly procedures in connection with the commercialization or use of the product. Once issued, the FDA may withdraw product approval if ongoing regulatory standards are not met or if safety problems occur after the product reaches the market. In addition, the FDA may require testing and surveillance programs to monitor the effect of approved products which have been commercialized, and the FDA has the power to prevent or limit further marketing of a product based on the results of these post-marketing programs.

45.     In addition, the 2017 10-K contained merely generic, boilerplate representations

regarding risks related to Sotagliflozin's review by the FDA, stating, in relevant part:

> *Clinical testing of our drug candidates in humans is an inherently risky and time-consuming process that may fail to demonstrate safety and efficacy, which could result in the delay, limitation or prevention of regulatory approval.*
>
> In order to obtain regulatory approvals for the commercial sale of any products that we or our collaborators may develop . . . we or our collaborators are required to complete extensive clinical trials in humans to demonstrate the safety and efficacy of our drug candidates. We or our collaborators may not be able to obtain authority from the FDA[.]
>
> A number of companies in the pharmaceutical industry have suffered significant setbacks in advanced clinical trials, even after achieving positive results in earlier trials . . . . Furthermore, we, one of our collaborators or a regulatory agency with jurisdiction over the trials may suspend clinical trials at any time if the subjects or patients participating in such trials are being exposed to unacceptable health risks or for other reasons.
>
> * * *
>
> Moreover, clinical trials may not show our drug candidates to be both safe and effective. Thus, the FDA . . . may not approve any additional drug candidates that we develop for any indication or may limit the approved indications or impose other conditions.

*Our drug candidates are subject to a lengthy and uncertain regulatory process that may not result in the necessary regulatory approvals, which could adversely affect our and our collaborators' ability to commercialize products.*

Our drug candidates, as well as the activities associated with their research, development and commercialization, are subject to extensive regulation by the FDA . . . . Failure to obtain regulatory approval for any drug candidate would prevent us from commercializing that drug candidate . . . . The process of obtaining regulatory approvals is expensive, and often takes many years, if approval is obtained at all, and can vary substantially based upon the type, complexity and novelty of the drug candidates involved . . . . Furthermore, prior to approving a new drug, the FDA typically requires that the efficacy of the drug be demonstrated in two double-blind, controlled studies. The regulatory process also requires nonclinical testing, and data obtained from nonclinical and clinical activities are susceptible to varying interpretations, which could delay, limit or prevent regulatory approval. In addition, delays or rejections may be encountered based upon changes in regulatory policy for product approval during the period of product development and regulatory agency review. Changes in regulatory approval policy, regulations or statutes or the process for regulatory review during the development or approval periods of our drug candidates may cause delays in the approval or rejection of an application.

(Emphasis in original).

46.     Appended as exhibits to the 2017 10-K were signed SOX certifications by the Individual Defendants "certify[ing] that:  1. Lexicon's [2017 10-K] fully complies with the requirements of section 13(a) or section 15(d) of the Securities Exchange Act of 1934, and 2. The information contained in the Periodic Report fairly presents, in all material respects, the financial condition and results of operations of Lexicon."

47.     The statements referenced in ¶¶ 26-46 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies.   Specifically, Defendants made false and/or misleading statements and/or failed to disclose that:  (i) the data from Lexicon's Phase 3 clinical trials assessing the safety and efficacy of Sotagliflozin in treating type 1 diabetes were not as positive as Lexicon represented; (ii) the health risks posed by

Sotagliflozin were severe enough to threaten its FDA approval prospects; and (iii) as a result, Lexicon's public statements were materially false and misleading at all relevant times.

### The Truth Begins to Emerge

48.     On January 17, 2019, the Advisory Committee met to vote on whether the overall benefits of Sotagliflozin outweighed its risks to support approval.

49.     The FDA prepared a briefing document for the panel members of the Advisory Committee, dated January 17, 2019 (the "Briefing Document"), for the Advisory Committee to consider when voting on Zynquista's benefit versus risk analysis.  In the section titled "Safety and Efficacy: Executive Summary and Conclusions," the Briefing Document stated that diabetic ketoacidosis ("DKA") "was the most notable and concerning adverse reaction associated with sotagliflozin."   Specifically, the FDA found the following:

- "Sotagliflozin was associated with an approximately 8-fold increase in DKA risk vs. placebo (95% CI: [3.1, 19.9]). The estimated number needed to harm (NNH) was approximately 26 patient-years of exposure to sotagliflozin to observe 1 additional DKA event (95% CI: [20.1, 38.5])";

- "Subgroup analyses showed a consistently elevated DKA risk associated with sotagliflozin, with estimated hazard ratios ranging from 4 to 11, and NNH ranging from 11 to 37";

- "The risk of DKA associated with sotagliflozin was consistently observed across subgroups";

- "The observed risk of DKA was highest, independently of treatment, in subjects with the following characteristics: prior DKA history, young age, high baseline A1c, and CSII insulin delivery method, i.e. pump use"; and

- "Sensitivity analyses by including pre-DKA and additional FDA-adjudicated DKA events (data not shown in these background materials) did not change the general conclusion."

50.     Aside from troubling data concerning the incidence of DKAs, the FDA's Briefing Document also summarized the implications of various serious adverse events ("SAEs") associated with Sotagliflozin:

Overall, there was a greater number of subjects in the sotagliflozin treatment group that reported treatment-emergent serious adverse events[] (SAEs) in comparison to the placebo group, with a total of 103/1049 subjects (9.8%) in the pooled sotagliflozin group, and 37/526 subjects (7.0%) in the placebo group. The greatest number of SAEs occurred in the system organ class (SOC) "Metabolism and Nutrition SOC", which occurred in 56/1049 subjects (5.3%) in the pooled sotagliflozin group, and in 9/526 subjects (1.7%) in the placebo group. The large majority of PTs within this SOC were "diabetic ketoacidosis", which occurred in 45 subjects (4.3%) in the pooled sotagliflozin group, and 3 subjects (0.6%) in the placebo arm. There was no imbalance in events of hypoglycemia, represented by the PT "hypoglycemia" within the "Metabolism and Nutrition SOC, and "hypoglycemic unconsciousness" within the "Nervous System Disorders SOC", with similar number of events in the three groups. Events of DKA and hypoglycemia are discussed in more detail below.

The next most common SOC was "Infections and Infestations", with a slightly greater number of events occurring in the pooled sotagliflozin group (1.6%) compared to the placebo group (1.0%). The PTs that occurred with greater frequency in the sotagliflozin group within this SOC were "pneumonia" and "gastroenteritis". There was no major imbalance in the incidence of SAEs in the remaining SOCs or PTs between treatment groups.

51.     The same day, Lexicon announced that the Advisory Committee had "voted eight to eight on the question of whether the overall benefits of [Lexicon's product] Zynquista (sotagliflozin) outweighed the risks to support approval," stalemating on the issue of whether Sotagliflozin's overall benefits outweighed its risks to support approval.

52.     On January 18, 2019, analysts began to digest the eight to eight vote by the Advisory Committee and how it impacted the Company's value.  For example, in a January 18, 2019 *The Motley Fool* article by Maxx Chatsko ("Chatsko"), titled "Here's Why Lexicon Pharmaceuticals Collapsed Today," Chatsko noted that "an advisory committee of the [FDA] reached a stalemate when deciding whether the benefits of Zynquista outweighed the risks.  The final vote was eight in favor of approval and eight against approval.  The impasse means investors have no way of knowing the path forward for the drug candidate[.]"  Chatsko also pointed out that

"analysts expected the drug candidate . . . to have blockbuster potential" that "might be in doubt now or, at the very least, the timeline has been pushed back."

53.     On this news, Lexicon's stock price fell $1.74 per share, or 22.6%, to close at $5.96 per share on January 18, 2019.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

54.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Lexicon securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

55.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Lexicon securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Lexicon or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

56.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

57.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

58.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Lexicon;

- whether the Individual Defendants caused Lexicon to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Lexicon securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

59.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

60.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Lexicon securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Lexicon securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

61. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

62. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

63. Plaintiff repeats and reallege each and every allegation contained above as if fully set forth herein.

64. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

65. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Lexicon securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Lexicon securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

66. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Lexicon securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Lexicon's finances and business prospects.

67. By virtue of their positions at Lexicon, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose

such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

68.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Lexicon, the Individual Defendants had knowledge of the details of Lexicon's internal affairs.

69.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Lexicon. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Lexicon's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Lexicon securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Lexicon's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Lexicon securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

70. During the Class Period, Lexicon securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Lexicon securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Lexicon securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Lexicon securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

71. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

72. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## **COUNT II**

**(Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)**

73. Plaintiff repeats and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

74.     During the Class Period, the Individual Defendants participated in the operation and management of Lexicon, and conducted and participated, directly and indirectly, in the conduct of Lexicon's business affairs.  Because of their senior positions, they knew the adverse non-public information about Lexicon's misstatement of income and expenses and false financial statements.

75.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Lexicon's financial condition and results of operations, and to correct promptly any public statements issued by Lexicon which had become materially false or misleading.

76.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Lexicon disseminated in the marketplace during the Class Period concerning Lexicon's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Lexicon to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Lexicon within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Lexicon securities.

77.     Each of the Individual Defendants, therefore, acted as a controlling person of Lexicon.  By reason of their senior management positions and/or being directors of Lexicon, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Lexicon to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Lexicon and possessed the

power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

78.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Lexicon.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: January 28, 2019

Respectfully submitted,

*/s/ Willie C. Briscoe*
Willie C. Briscoe
Texas Bar No.: 24001788
Southern District No.: 25157
**THE BRISCOE LAW FIRM, PLLC**
12700 Park Central Drive, Suite 520
Dallas, Texas 75251
972-521-6868
281-254-7789 (Facsimile)
wbriscoe@thebriscoelawfirm.com

**POMERANTZ LLP**
Jeremy A. Lieberman
J. Alexander Hood II
Jonathan Lindenfeld
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email: jalieberman@pomlaw.com
ahood@pomlaw.com
jlindenfeld@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:  (312) 377-1184
Email:  pdahlstrom@pomlaw.com

*Attorneys for Plaintiff*